**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CRIMINAL ACTION NO. 12-11-DLB-EBA**

**UNITED STATES OF AMERICA**                                                          **PLAINTIFF**


**vs.**                          **MEMORANDUM OPINION AND ORDER**


**JARRAL D. PERKINS**                                                          **DEFENDANT**

*** *** *** ***

## I.    INTRODUCTION

Defendant is charged in a two count Indictment with (1) conspiring to knowingly and intentionally distribute and possess with intent to distribute Oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and (2) conspiring to launder money in violation of 18 U.S.C. § 1956.

This matter is presently before the Court on four (4) defensive motions from the Defendant: (1) a motion for disclosure of exculpatory and impeachment evidence (Doc. # 30); (2) a motion to preclude co-conspirator hearsay statements (Doc. # 31); a motion to suppress evidence seized from Defendant's residence and vehicle (Doc. # 32); and a motion to dismiss for lack of venue or, alternatively, to transfer venue (Doc. # 33). The motions have been fully briefed (Docs. # 39, 40, 41, 42, 44, 45), and are thus ripe for review. For reasons explained herein, each motion will be **denied**.

## II.    FACTUAL BACKGROUND

On June 19, 2012, Officer Jarred Grimmett of the DEA Task Force in Las Vegas, Nevada, presented an affidavit to a federal Magistrate Judge for the District of Nevada, for the search of three properties.  The affidavit details a coordinated investigation by DEA Agents in Las Vegas, Nevada and the Eastern District of Kentucky into an Oxycodone drug ring involving Defendant Jarral Perkins, Michael Logan, and Brandon Logan (Doc. # 32-1). Upon reviewing the affidavit, United States Magistrate Judge George Foley, Jr. authorized the search of the following places:  9301 West Alta, Tower 2, Unite 906, Las Vegas, Nevada, 89135; a "room safe" located in 9301 West Alta, Tower 2, Unite 906, Las Vegas, Nevada, 89135; and a 2011 Infiniti 4-door wagon, license plate LVXR70.  Pursuant to the search warrants, officers searched each of those locations and seized the following: $575,385.00 in U.S. currency, firearms, tools and containers with wax residue, a money counter, phones, and shipping labels from Kentucky.   The facts that follow describe the DEA Agents' investigation into Defendant's criminal activities and are gleaned solely from Agent Grimmett's affidavit.

On January 12, 2012, Las Vegas Metropolitan Police Department ("LVMPD") Officers were called to the Suncoast Hotel and Casino located in Las Vegas, Nevada, because hotel workers had found several thousand pills in a hotel room safe.  Upon arriving, officers learned that Chrisada Suwannetr had previously occupied the room and had failed to take the pills with him.  Suwannetr returned to the hotel later that day to extend his stay.  He was arrested for possession of what was later confirmed to be 8,729 Oxycodone tablets, 220 Acetampinophen Oxycodone tablets, and 2 Aplrazolam tablets.

Agent Grimmet received information from fellow LVMPD officers about Suwannetr's arrest at the hotel and began an investigation into his involvement in the distribution of controlled substances. Grimmet learned that Suwannetr and his associate, Defendant Jarral Perkins, were being investigated by the Internal Revenue Services for suspected crimes across the United States. Grimmet also learned that both Suwannetr and Defendant had been involved in a suspicious Currency Transaction Report ("CTR") dated March 30, 2011, which indicated that they had received $12,000.00 from Brandon Logan of Olive Hill, Kentucky.

Suwannetr was released from custody at some point thereafter, although the date of his release is not mentioned in the Affidavit. Upon his release, Grimmet and others conducted surveillance on Suwannetr in an attempt to determine his source of supply. During their surveillance, they continued to observe Suwater meeting with Defendant, confirming that they had some sort of relationship. The Affidavit does not mention that the officers observed Suwannetr or Defendant engage in any nefarious conduct during their meetings.

On June 14, 2012, Las Vegas DEA Agents learned about a drug trafficking operation involving Brandon Logan – who had appeared on the March 30, 2011 CTR – and his brother, Michael Logan, taking place in and around Olive Hill, Kentucky. Las Vegas DEA Agent Frank Hicks received a phone call from Drug Task Force Detective Ned Crisp, an agent in Kentucky, that the Task Force had been conducting an investigation of Brandon Logan. They had recently stopped a vehicle driven by Lewis Roseberry near Olive Hill, and Roseberry admitted to possessing a quantity of Oxycodone pills that he had received from Brandon Logan. Roseberry identified Brandon Logan's address as 2001 State Hwy 1662,

Olive Hill, Kentucky 41164, and admitted that he had purchased pills from Logan at that residence on a daily basis.

Pursuant to a search warrant, Drug Task Force Officers conducted a search of Brandon Logan's residence in the afternoon hours of June 14, 2012. While officers were conducting the search, Michael Logan appeared at the front door of his brother's home. Michael Logan admitted to the officers that he was there for the purpose of trafficking in Oxycodone and agreed to speak to detectives. Before speaking, though, officers seized $3,000.00 from him.

During the interview, Michael Logan advised officers that he had traveled to Las Vegas, Nevada, two years earlier and met a man named "Jim" at a pain clinic. Over the two years that followed, Michael Logan received weekly shipments of Oxycodone pills from "Jim," beginning with 100 pills and increasing to 1,000 pills, and ultimately totaling in the tens of thousands of pills. Although Michael Logan was not able to provide "Jim's" actual name, he provided officers with "Jim's" physical description, including his approximate height, weight, age, build and physical features. He also described the general area that "Jim" lived and some of "Jim's" social habits. Finally, he provided the last address that he was supposed to use to send drug proceeds back to "Jim."

DEA Agents contacted the DEA Resident Office in Las Vegas, Nevada, in an attempt to identify "Jim." DEA Las Vegas Task Force Agent Shayne Skipworth sent Michael Logan a photograph of the individual that lived at the address he provided. Logan, however, advised that was not the person he knew as "Jim." Through further inquiry, Agent Skipworth learned that DEA and IRS Agents in Las Vegas were investigating Defendant Jarral Perkins, and that he matched the description of "Jim." Agent Skipworth provided

Kentucky DEA Agents with Defendant's Nevada driver's license, who, in turn, showed it to Michael Logan. Logan positively identified Defendant as the man he knew as "Jim."

Michael Logan also provided DEA Agents with details about how he received drug shipments from the Defendant. Logan described Defendant as being "meticulous" in the manner he packaged the drugs for shipment. Defendant would frequently store the Oxycodone tables inside a glass jar, and then secret the jar inside an outdoor-style candle. He would ship the candle to fictitious names at various locations in eastern Kentucky, using a variety of shipping services. The packages were then tracked via the internet by their tracking numbers. Logan used the same method to ship drug proceeds back to Defendant in Nevada. Logan also advised that Defendant would send him prepaid cell phones for them to communicate about their shipments.

In addition to the general details about their shipping practices, Michael Logan also advised the officers that he had a package of U.S. currency prepared to ship to Defendant. On June 15, 2012, Michael Logan led detectives to a residence in Olive Hill, Kentucky, where he was storing the package. Detectives found a gift basket containing a large outdoor-style candle, just as Logan had described. Inside the candle, detectives found approximately $34,960.00 in U.S. currency. Logan advised that Defendant was expecting the package to be sent sometime in the next few days.

Michael Logan also told Agents that he was expecting a shipment of Oxycodone from Defendant. The package had been shipped to a Comfort Inn and Suites, Room 125, in Morehead, Kentucky, and was expected to be delivered on June 15th or 16th. Logan expected that the package would contain approximately 5,000 30 milligram Oxycodone tablets. Logan also provided Agents with the United States Postal Service tracking number

for the package.

Finally, Michael Logan provided Agents with a phone number – (702) 576-5899 – that he used to contact Defendant. Agents recorded four calls between Logan and Defendant. In one of those calls, Defendant mentioned the Oxycodone shipment and its tracking number, and verified that it was to be delivered on June 15th. DEA Agents used the tracking number provided by Defendant to locate the package at a shipping facility in Lexington, Kentucky. Agents contacted the USPS Postal Inspector to confirm the location of the package and requested that the package be held in Morehead, Kentucky.

On June 16, 2012, Agents and Michael Logan went to the post office in Morehead, Kentucky, to examine the package. Logan confirmed that the shipping name and address on the package matched the fictitious information provided by Defendant. Thereafter, Logan signed a consent form for DEA Agents to search the package. Inside the package, Agents found a large outdoor-type candle in a metal tub, just as Logan had previously described. Agents removed the wax from the candle and found a glass jar inside, again just as Logan had described. Inside the glass jar were several sandwich-sized bags, each wrapped in aluminum foil. The bags contained 4,696 blue tablets, which Agents believed to be 30 milligram Oxycodone tablets.

Two days later, DEA Agents in Las Vegas and Kentucky coordinated efforts for Michael Logan to send Defendant a package purportedly containing U.S. currency as payment for the shipment of Oxycodone. Logan contacted Defendant and told him to expect a shipment of "103" in a forthcoming package. The Affidavit states that "103" is slang for $103,000.00 in U.S. currency. Defendant thereafter sent Logan a text message with directions to send the package to "J. Patton" at 4591 Ordway Drive, Las Vegas,

Nevada, 89139. Logan then guided the Agents as they prepared the package similarly to the way Logan had previously prepared packages to Defendant. The Agents shipped the package to the address provided by Defendant, and tracked it via a UPS tracking number.

Michael Logan called Defendant to confirm that the payment had been shipped. That phone call was recorded by DEA Agents. Logan told Defendant, "Got that out for you should be around 103." Defendant replied, "Okay buddy." Logan later explained to DEA Agents that "103" referred to $103,000.00 in U.S. Currency.

On June 19, 2012, Agent Grimmet received a copy of an arrest warrant for Defendant Perkins issued by United States Magistrate Judge Edward Atkins of the Eastern District of Kentucky. In an effort to locate and arrest Defendant, Agents set up surveillance at both the package drop-off address and Defendant's residence at 9301 W. Alta, Las Vegas, Nevada. Agents observed an unknown white male drive up to the drop-off address in a white Chevrolet, accompanied by an unknown black male. A short time thereafter, UPS arrived with the package. The white male exited the vehicle, took possession of the package and loaded it into the trunk. The black male got into another vehicle and drove away. The white male then returned to the white Chevrolet and departed the drop-off address.

As Agents trailed the white Chevrolet, other Agents set up outside Defendant's residence. They received word that Defendant had just contacted Michael Logan to confirm the tracking number and estimated delivery time. They then observed Defendant exit his residence and drive away in a 2011 Infiniti 4-door sport utility vehicle. Agents pursued closely behind.

Agents followed both Defendant and the unknown white male to 4631 South Dean Martin, Las Vegas, Nevada. Agents observed Defendant take a package out of the unknown white male's vehicle, place it in his Infiniti and drive off. While Agents followed Defendant, Agent Grimmet contacted the LVMPD and requested that they conduct a traffic stop of Defendant's vehicle. An LVMPD officer responded in a marked vehicle, pulled behind Defendant and initiated his sirens. Defendant pulled into a parking lot and was taken into custody. Defendant later told officers during his administrative processing that he had stored approximately $500,000.00 in a safe at his residence. He also provided officers with the combination for the safe.

Pursuant to the search warrants at issue here, Agents search Defendant's residence, safe, and vehicle, and seized: $575,385.00 in U.S. currency, firearms, tools and containers with wax residue, a money counter, phones, and shipping labels from Kentucky. Defendant seeks to suppress this evidence.

## III.    ANALYSIS

### A.    Motion to Suppress

Defendant challenges the search of his vehicle, residence, and safe on four grounds: (1) Agent Grimmet's affidavit is not incorporated into the warrant issued by the Magistrate Judge, rending the warrant facially defective; (2) the affidavit fails to establish the requisite nexus between his residence and the evidence sought; (3) the affidavit does not contain reliable information to support a finding of probable cause; and (4) the officers could not have relied on the defective warrant in good faith. As explained herein, the Court finds that the warrant is not facially defective, and that the affidavit presented to the Magistrate Judge established probable cause for the search of Defendant's property. Therefore, the Court

need not address the good faith exception.

As a threshold issue, Defendant argues the warrants are facially defective because they do not incorporate Agent Grimmet's affidavit by reference. But Defendant's argument is based on an incorrect statement of law. The Fourth Amendment requires that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. The specificity requirement is generally fulfilled by "an adequate description on the face of the search warrant." *Sanders v. Parrish*, 141 F. App'x 412, 414-15 (6th Cir. 2005). "'The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.'" *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989) (quoting *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979)).

If the warrant is adequate on its face, there is no need to incorporate the affidavit by reference, as Defendant has suggested. Instead, that principle, called "cure by incorporation," only applies when the warrant itself fails to contain adequate specificity. *Sanders*, 141 F. App'x at 415. Under that principle, a warrant may be cured if an affidavit that particularly describes the place to be searched and things to be seized is either referenced in or attached to the warrant. *Id.*

Here, each of the warrants specifically described the "place[s] to be searched" as required by the Fourth Amendment. The warrant for Defendant's residence contained the following description of the "place to be searched":

**Subject Premises 1:** PERKINS' residence, including all containers and safes, is located at 9301 West Alta, Tower 2, United 906, City of Las Vegas, 89135, County of Clark, State of Nevada, more particularly described and located inside the [sic] as a multi-story multi-family dwelling, known as Queen's One Place. Tower 2 is tan in color and located on the west end of the complex. The front doors of Tower 2 are decorative glass and face a northwest direction. Unit 906 is located on the 9th floor of Tower 2. The front door to Unit 2 is brown in color and faces to the west. The numbers 906 are black in color and located on a white placard, at eye level, just north of the front door.

(Doc. # 31-1 at 17). With similar specificity, the warrant to search Defendant's vehicle describe the "place to be searched" as:

**Subject Vehicle:** 2011 Infiniti 4-Door Wagon with Vehicle Identification Number: LN8AZ2NFXB9502181; bearing Nevada license plate LVXR70, registered to Mary Landa at 832 Vineyard Vine Way, North Las Vegas, Nevada, 89032. Vehicle is parked in a secure lot under the custody and control of the Las Vegas Drug Enforcement Administration, located at 550 S. Main Street, Las Vegas, Nevada 89101.

(*Id.* at 23). Finally, the warrant to search Defendant's safe described it as:

A black, cube-shaped safe with a combination-type spin dial in the middle of the safe door, located inside a bedroom at 9301 West Alta, Tower 2, Unit 906, City of Las Vegas, 89135, County of Clark, State of Nevada, more particularly described and located inside the [sic] as a multi-story multi-family dwelling, known as Queen's One Place. Tower 2 is tan in color and located on the west end of the complex. The front doors to Tower 2 are decorative glass and face a northwest direction. Unit 906 is located on the 9th floor of Tower 2. The front door to Unit 906 is brown in color and faces to the west. The numbers 906 are black in color and located on a white placard, at eye level, just north of the front door.

(*Id.* at 20). These descriptions gave the executing officer sufficient information to identify the subject property with reasonable effort and little chance of mistakenly searching another premises.

The warrants also specifically described the "things to be seized" as required by the Fourth Amendment. They each described the "things to be seized" as follows:

For the period of January 2011 through the present, the following records, documents, and materials, whether in documentary form or stored on any electronic optical or computer media, as evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (drug distribution):

a.   Controlled substances including but not limited to oxycodone and hydrocodone

b.   United States currency in an amount exceeding $2,000.00

c.   Ledgers, customer lists, pharmacy information, correspondence, notations, logs, receipts, journals, books, and records relating to the prescription of oxycodone and hydrocone,

d.   Bank account records, wire transfer records, bank statements, safe deposit box keys and records, financial instruments purchased with currency in the sum of $1,000 or more, and financial records showing payment, receipt, concealment, transfer, or movement of currency.

e.   Records, documents, titles, mortgage paperwork, and deeds reflecting the purchase, rental or lease of any real property.

f.   Personal telephone and address books and listing, letters, cables, telegrams, telephone bills, personal notes, and other items reflecting names, addresses and telephone numbers, communications, and illegal activities of associates in drug trafficking activities.

g.   Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, conveyances and/or residences.

This description adequately apprised the executing officers of the things to be seized.

Accordingly, the warrants met the Fourth Amendment specificity requirement and, thus, did not need to be saved by an attached or incorporated affidavit.

Because the warrants are not facially deficient, the question becomes whether the magistrate judge had a substantial basis to find that the affidavit established probable

cause to believe that evidence will be found at the place cited. *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009). This requires the Court to look solely at the four corners of the affidavit, and in a commonsense manner determine whether the totality of the circumstances supports a finding of probable cause. *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). "The magistrate's determination of probable cause is afforded great deference, and that determination should be reversed only if the magistrate arbitrarily exercised his discretion." *Id.*

Probable cause for a search warrant exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* This requires the affidavit to show a "nexus between the place to be searched and the evidence sought." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005). In drug trafficking cases, the Sixth Circuit permits the issuing magistrate judge to "infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

When the affidavit relies on information provided by an informant, there must be some indication in the affidavit that the informant is reliable. "[W]here a person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate may believe that evidence of a crime will be found." *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000). "Alternatively, an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroboration information." *Woosley*, 361 F.3d at 927.

Here, the affidavit provides ample information connecting Defendant's vehicle, residence and safe to the things to be seized. Before Defendant's conspiracy with individuals in Kentucky was uncovered, Las Vegas DEA Agents learned that Defendant was associated with an individual – Chrisada Suwannetr – who had accidentally left nearly 9,000 pain pills in a Las Vegas hotel. Those Agents then learned through a Currency Transaction Report that Defendant and Suwannetr had recently received $12,000 from Brandon Logan in Olive Hill, Kentucky. This information gave Agents some reason to believe that Defendant was distributing pain pills to Kentucky in exchange for cash. More importantly, this gave Agents reason to believe that Defendant was a large-scale drug trafficker. And as the Sixth Circuit recognizes, the magistrate judge is free to infer that drug traffickers use their homes and other effects to store drug and operate their drug business. *See Williams*, 544 F.3d at 687.

The affidavit also details additional information developed by DEA Agents in Kentucky that demonstrates Defendant was involved in a large-scale drug trafficking conspiracy. As the affidavit states, Defendant shipped thousands of pills to Michael Logan in Kentucky, hidden inside outdoor candles. Defendant instructed Logan to send payment for the pills back to him at various fictitious addresses, and using the same packaging methods. Importantly, the affidavit details one particular package sent by Defendant that was intercepted by Agents. It included approximately 4,696 blue tablets, which Agents believed to be 30 milligram Oxycodone tablets. All of this information, provided in the affidavit, indicates that Defendant was involved in a large-scale drug trafficking conspiracy, which alone is sufficient for the Magistrate Judge to infer a nexus between his residence and the things to be seized.

But the affidavit goes beyond the fact that Defendant is involved in drug trafficking to establish a nexus between his residence, vehicle, and safe and the things to be seized; it also details Defendant's actions and statements that directly link each of those places to his drug trafficking operation. Once the package containing supposed currency was delivered in Las Vegas, Defendant sent a text message to Michael Logan confirming the tracking number and expected delivery date. A short time later, officers observed Defendant leaving his residence, indicating that he sent the text message from inside his residence. This information provided further reason to believe that Defendant was operating his drug trafficking operation out of his residence.

Defendant then got in his vehicle and met the man who received the package. Defendant got out of his vehicle, put the package in his trunk, and then drove away. He believed the package contained approximately $103,000.00, representing the proceeds of two pill shipments to Kentucky. These facts, all contained in the affidavit, establish that Defendant used his vehicle to transport proceeds of his drug trafficking operation.

After Defendant was arrested, he confessed that he was storing $500,000.00 in cash in a safe at his residence. With all of the information in the affidavit detailing Defendant's large-scale drug trafficking operation, the Magistrate Judge had a substantial basis to conclude that this money represented proceeds of Defendant's illegal operation. And ultimately all of this information provided a sufficient nexus between the places to be searched and the things to be seized.

The affidavit also contained sufficient evidence for the Magistrate Judge to conclude that the information provided by Michael Logan was reliable, as it was corroborated with rich detail. Logan initially told Agents that he received weekly shipments of Oxycodone

from a man named "Jim." Thereafter, Logan was able to identify "Jim" as the Defendant by the picture on his Nevada driver's license. Logan provided Agents with detailed information about how Defendant would send him packages of Oxycodone, and specifically provided information about a particular package on its way to Kentucky. Through a tracking number Defendant had given to Logan, and Logan had relayed to Agents, the Agents were able to locate the package at a post office in Morehead, Kentucky. Inside the package, Agents found Oxycodone packaged just as Logan had described it to have been packaged in the past: contained in a glass jar that was inside an outdoor candle. The package contained 4,696 Oxycodone tablets in total, just shy of the 5,000 pills Logan expected.

While the intercepted package alone only corroborated Logan's statements that he received large-scale Oxycodone shipments, what the Agents learned next further corroborated Logan's statements that he received those packages *from* Defendant. DEA Agents in Kentucky sent a package back to Las Vegas that purportedly contained $103,000 in cash as payment for the Oxycodone shipment. They shipped the package to an address that a man Logan believed to be the Defendant had provided. When the package arrived in Las Vegas, it was delivered to an unknown white male. Agents then watched Defendant meet the unknown white male and take possession of the package. This additional surveillance corroborated Logan's identification of Defendant as his source of supply. Thus, under the totality of the circumstances, the affidavit proved Logan to be reliable and provided the magistrate judge with a substantial basis to find probable cause that Defendant's residence, vehicle, and safe contained evidence of his drug trafficking operation. For all of these reasons, Defendant's motion to suppress is **denied**..

**B.      Motion to Dismiss for Lack of Venue or, Alternatively, to Change Venue**

Defendant moves to dismiss the Indictment against him on the ground that venue is not proper in the Eastern District of Kentucky.  Alternatively, Defendant moves the Court to transfer this case to the District of Nevada.  However, aside from offering the legal standard by which the Court must consider motions to transfer venue, Defendant fails to offer any argument about why his alternative motion should be granted.

"Unless a statute or [the Federal Rules of Criminal Procedure] permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.  Here, Defendant is charged in a two-count Indictment for conspiring to knowingly and intentionally distribute and possess with intent to distribute Oxycodone and conspiring to launder money, both in the Eastern District of Kentucky and elsewhere. For each of these offenses, venue is proper, *inter alia*, in any district in which an overt act in furtherance of the conspiracy was committed.  *Whitfield v. United States*, 543 U.S. 209, 218 (2005) ("The provision authorizes two alternative venues for money laundering conspiracy prosecutions: (1) the district in which venue would lie if the completed substantive money laundering offense had been accomplished, or (2) any district in which an overt act in furtherance of the conspiracy was committed."); *United States v. Castaneda*, 315 F. App'x 564, 570 (6th Cir. 2009) ("We reaffirm that venue in a drug conspiracy is "proper in any district where the conspiracy was formed or where an overt act in furtherance of the conspiracy was formed.").  So long as this standard is met, the conspiracy defendant need not enter the forum district for venue to be proper. *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001).

As set forth in Agent Grimmet's affidavit in support of the search warrants, the United States has set forth the facts it intends to introduce at trial to show that an act in furtherance of both the drug and money laundering conspiracies was committed in the Eastern District of Kentucky. Because those facts have already been discussed in great detail, the Court need not repeat them at length here. To summarize, the United States intends to prove that Defendant shipped packages of Oxycodone to Michael Logan in the Eastern District of Kentucky on a weekly basis. Michael Logan, in turn, distributed those drugs within the Eastern District of Kentucky to lower level dealers or users. Michael Logan packaged the payment for the drugs in the Eastern District of Kentucky and shipped it back to Defendant in Las Vegas. Additionally, Defendant shipped cell phones to Michael Logan in the Eastern District of Kentucky, which were used by the conspirators to discuss their drug trafficking operation. These overt actions establish that venue is proper in the Eastern District of Kentucky for both the drug trafficking and money laundering conspiracies.

Within Defendant's venue argument, he also argues a fatal variance is likely to occur because the evidence to be adduced at trial will show that Defendant's conspiracy, if any, did not touch the Eastern District of Kentucky. Rather, he suggests that his alleged co-conspirator, Michael Logan, was a part of other conspiracies within the Eastern District of Kentucky to distribute Oxycodone. Defendant, he claims, did not participate in or know about those conspiracies. If there is a possibility that the jury would convict him based upon these other conspiracies, Defendant believes a fatal variance will occur.

Defendant's fatal variance argument is both factually and legally flawed. Factually, the United States represents that it will provide evidence that Defendant shipped Oxycodone to the Eastern District of Kentucky, and that he was Michael Logan's supplier.

If this is the proof at trial, Defendant's actions certainly touched the Eastern District of Kentucky, and Defendant is simply wrong to suggest otherwise.

Legally, the inquiry is whether the "indictment alleged one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008).

> To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal. A single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy. Drug conspiracies are often chain conspiracies which normally involve numerous sales and resales of drugs until they reach the ultimate consumers. Because the success of participants on each level of a distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants.

*Id.* (internal citations and quotations omitted).

So long as the evidence introduced at trial is consistent with the facts set forth in the affidavit supporting the search warrant, the United States will be able to establish that Defendant was involved a single, "chain conspiracy." There will be evidence to show that Defendant supplied Michael Logan with weekly shipments of Oxycodone. Michael Logan and his brother, Brandon Logan, turned around and sold those pills to others in the Eastern District of Kentucky. It is unclear at this point whether the government will put on proof that those purchasers sold the pills yet again. If the United States does present this type of proof, that will only solidify the point that Defendant was a member of a single, chain conspiracy. While Defendant may not have known the lower-level suppliers, the jury could infer from the sheer volume of pills Defendant shipped to Kentucky that Michael Logan was

selling those pills in bulk quantities to lower level dealers. Logan's agreement with those lower level dealers was a part of Defendant's conspiracy to distribute Oxycodone in Kentucky. As such, the Court finds there is not likely to be fatal variance because there is little risk that the United States will produce evidence that can *only* be construed as supporting a finding of multiple conspiracies. Therefore, Defendant's motion to dismiss the Indictment for lack of venue is **denied**.

Defendant's motion to transfer this case to the District of Nevada will likewise be **denied**. In deciding such a motion, the Court must first determine whether the action could have been brought in the proposed transferee district. *United States v. Gonzales & Gonzales Bonds and Ins. Agency, Inc.*, 677 F. Supp. 2d 987, 992 (W.D. Tenn. 2010). Here, the parties appear to agree that this case could have been brought in Nevada.

The pivotal inquiry is, thus, whether the Court will exercise its discretion and transfer this case to Nevada for the convenience of parties and witnesses, and in the interest of justice. *Id.* (citing 28 U.S.C. § 1404(a)). A non-exhaustive list of four factors guides this determination: (1) the location of willing and unwilling witnesses; (2) the residence of the parties; (3) the location of the sources of proof; and (4) the location of the events that gave rise to the dispute. *Id.* Aside from Defendant residing in Las Vegas, none of the remaining factors weigh in favor of transferring this matter to Nevada. Defendant has not shown that any of his potential witnesses will be traveling from Nevada. To the extent the government will be calling witnesses from Nevada, they all appear to be government Agents that will travel at the government's expense. Moreover, the location of the proof and events giving rise to this dispute are, at best for Defendant, split between Kentucky and Nevada. While evidence was seized from Defendant's property in Las Vegas, other incriminating evidence

and actions took place in Kentucky.  A package of Oxycodone shipped by Defendant was seized in Kentucky, a package of purported payment for the Oxycodone was shipped to Defendant from Kentucky, and the pills Defendant supplied were further distributed in Kentucky.  When these factors are considered as a whole, the Court finds that Kentucky is the appropriate forum to try this case.

### C.    Motion to Preclude Evidence of Co-Conspirator Hearsay Statements

Defendant believes the United States intends to offer co-conspirator hearsay testimony and asks the Court to hold a pre-trial hearing to determine whether those statements are admissible pursuant to Federal Rule of Evidence 801(d)(2)(E).  Without identifying any particular testimony, Defendant argues that the government will not be able to establish the proper foundation for the statements to admit them under the co-conspirator exception.  Specifically, Defendant suggests the government will not be able to establish that he conspired with any of the purported co-conspirators or that the statements were made in furtherance of a conspiracy.

The United States responds that it will call cooperating witnesses and co-conspirators to testify *only* to statements made by Defendant.  The United States will do this two ways: through direct testimony and playing recorded conversations between the witnesses and Defendant.  The United States argues that the testimony and recorded conversations will be admissible under Federal Rule of Evidence 801(d)(2)(A) as statements made by a party opponent.

To the extent the United States intends to call witnesses to testify about Defendant's prior statements, that testimony is admissible pursuant to Federal Rule of Evidence 801(d)(2)(A).  This testimony is quintessentially a statement made by a party opponent and

is, therefore, considered admissible non-hearsay.

The recorded conversations require a more detailed analysis. Any statements made by Defendant in those conversations are admissible under Federal Rule of Evidence 801(d)(2)(A). *United States v. Henderson*, 626 F.3d 326, 337 (6th Cir. 2010). However, the admissibility of any other person's statements on the recordings depends on the purpose for which those statements are being offered. If the United States intends to offer those statements only to provide context for Defendant's statements – and not for the truth of the matters asserted – they are not hearsay and will be admitted. *Id.* If, on the other hand, the United States intends to offer other individuals' statements on the recordings for the truth of the matters asserted, those statements are potentially admissible under the co-conspirator exception of Rule 801(d)(2)(E). The Sixth Circuit has "long recognized the trial court's prerogative to conditionally admit co-conspirator statements subject to a later demonstration of their admissibility by a preponderance of the evidence.'" *United States v. Robinson*, 390 F.3d 853, 867 (6th Cir. 2004) (quoting *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979)). Exercising the discretion afforded this Court, the Court will not hold a pre-trial hearing to determine the admissibility of co-conspirator statements on the recordings, but instead, will conditionally admit those statements pending further demonstration of their admissibility. Accordingly, Defendant's motion to exclude co-conspirator hearsay statements is **denied**.

### D.     Motion for Disclosure of Exculpatory and Impeachment Evidence

Lastly, Defendant moves the Court to compel the United States to disclose all exculpatory and impeachment evidence in its possession. The United States responds that it recognizes its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose

exculpatory information and has done so to the extent it has any such evidence. Pursuant to the United States' representation, the Court will **deny as moot** Defendant's motion for disclosure of exculpatory information.

However, the United States objects to any Order compelling it to produce impeachment evidence prior to trial. That evidence, the United States contends, is considered Jencks Act material and is not required to be disclosed until the witness testifies. Defendant replies that "the Sixth Circuit favors the practice of disclosing Jencks material well in advance of trial," (Doc. # 44 at 2), citing *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988).

Defendant incorrectly states Sixth Circuit precedent on the United States' obligation to disclose Jencks Act material prior to trial. In *United States v. Presser*, the Sixth Circuit held that "the district court overstepped its authority when it ordered the government to disclose impeachment evidence before trial, even though the court later clarified that it was ordering the disclosure only of impeachment evidence 'which tends to negate guilt.'" *Presser*, 844 F.2d at 1284. The court restated the "clear and consistent rule of [the Sixth Circuit] . . . [is] that the intent of Congress in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial." *Id.* at 1283. Even when the impeachment evidence potentially falls under *Brady*, the *Presser* Court held that it is not required to be disclosed pretrial. *Id.* Instead, it must be disclosed in time for "effective" use at trial, which can include during trial so long as the trial court orders a recess if requested to allow the defendant to examine the material and decide how to use it. *Id.* at 1284.

The *Presser* decision squares with the Sixth Circuit's earlier decision in *United States v. Algie*, 667 F.2d 569 (6th Cir. 1982), which held that the district court could not use its inherent power to compel the government to produce Jencks Act material prior to trial. *Id.* at 572. The *Algie* Court recognized that the United States Attorney shall be left with the sole discretion to produce Jencks Act material prior to trial. *Id.* Based on this well-settled precedent, the Court will not compel the United States to produce Jencks Act material prior to trial and will **deny** Defendant's motion to do so.

IV.      **CONCLUSION**

Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1)      Defendant's motion for disclosure of exculpatory and impeachment evidence (Doc. # 30) is hereby **denied**;

(2)      Defendant's motion to preclude co-conspirator hearsay statements (Doc. # 31) is hereby **denied**;

(3)      Defendant's motion to suppress evidence seized from his residence, safe, and vehicle (Doc. # 32) is hereby **denied**; and

(4)      Defendant's motion to dismiss for lack of venue or, alternatively, to transfer venue (Doc. # 33) is hereby **denied**.

This 11th day of July, 2014.



Signed By:

*David L. Bunning*

**United States District Judge**

G:\DATA\ORDERS\Ashland Criminal\2012\12-11 MOO denying Ds pretrial motions.wpd